**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MANUELA VILLA,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>MARICOPA COUNTY; MARICOPA COUNTY BOARD OF SUPERVISORS; WILLIAM GERARD MONTGOMERY, Maricopa County Attorney,<br>*Defendants-Appellees.* | No. 15-15460<br><br>D.C. No.<br>2:14-cv-01681-DJH<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted February 13, 2017
San Francisco, California

Filed August 2, 2017

Before: William A. Fletcher and Johnnie B. Rawlinson, Circuit Judges, and Robert W. Pratt,[*] District Judge.

Opinion by Judge W. Fletcher

---

[*] The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

## SUMMARY[**]

### Civil Rights / Standing / Preemption

The panel affirmed on different grounds the district court's dismissal of Manuela Villa's putative class action against Maricopa County defendants, alleging that portions of the Arizona wiretapping statute, and the County's practices thereunder, were preempted by and violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq.

The panel held that Villa lacked Article III standing to seek injunctive or declaratory relief on behalf of herself or a putative class, but that she had standing to pursue individual damages.

On the merits, the panel held that Ariz. Rev. Stat. § 13-3010(A), as applied by Maricopa County officials, was preempted by Title III, and that Villa's rights under 18 U.S.C. § 2516(2) were violated because applications for wiretaps were not made by the "principal prosecuting attorney." The panel held further that Ariz. Rev. Stat. § 13-3010(H) was not preempted by Title III if it was construed to require that recordings of intercepted conversations be submitted to a court for sealing within ten days of the termination of the court's order authorizing a wiretap on each particular target date.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that Villa's rights under 18 U.S.C. § 2518(8)(a) were violated because the recordings of her intercepted conversations were submitted for sealing more than a month after the termination of the order authorizing the wiretap on the target line on which her conversations were intercepted.

Finally, the panel held that because the law enforcement officials were acting in good faith within the meaning of 18 U.S.C. § 2520(d), they were protected from a damage judgment.

## COUNSEL

Cameron A. Morgan (argued), Scottsdale, Arizona, for Plaintiff-Appellant.

James Kenneth Mangum (argued), Deputy County Attorney; William G. Montgomery, Maricopa County Attorney; Civil Services Division, Maricopa County Attorney's Office, Phoenix, Arizona; for Defendants-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Law enforcement officials in Maricopa County intercepted and recorded eight conversations between Plaintiff Manuela Villa and her daughter in 2011 and 2012. The target phone number over which Villa's conversations were intercepted belonged to neither Villa nor her daughter. The wiretap application was authorized by Maricopa County

Attorney William G. Montgomery, but the application was made by Deputy County Attorney Jennifer Brockel. Before making the application, Brockel personally reviewed a lengthy supporting affidavit. Montgomery did not review the affidavit supporting the application.

After Villa learned that her conversations had been intercepted, she brought a would-be class action against County Attorney Montgomery, the Maricopa County Board of Supervisors, and Maricopa County ("Defendants"), alleging that portions of the Arizona wiretapping statute, as well as the county's practices adopted in reliance on the statute, were preempted by and violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. ("Title III"). Villa also alleged that her Fourth Amendment rights had been violated.

The district court concluded that Arizona's wiretapping statute and practices thereunder were not preempted by, and did not violate, Title III. The court dismissed Villa's suit in its entirety under Federal Rule of Civil Procedure 12(b)(6). The court did not discuss Villa's Fourth Amendment claim. Villa has appealed only the court's adverse rulings on her Title III claims.

We hold that Villa lacks Article III standing to seek injunctive or declaratory relief on behalf of herself or a putative class, but that she has standing to pursue individual damages. On the merits, we hold that Ariz. Rev. Stat. § 13-3010(A), as applied by Maricopa County officials, is preempted by Title III, and that Villa's rights under 18 U.S.C. § 2516(2) were violated because applications for wiretaps were not made by the "principal prosecuting attorney." We hold, further, that Ariz. Rev. Stat. § 13-3010(H) is not

preempted by Title III if it is construed to require that recordings of intercepted conversations be submitted to a court for sealing within ten days of the termination of the court's order authorizing a wiretap on each particular target line. However, Villa's rights under 18 U.S.C. § 2518(8)(a) were violated because the recordings of her intercepted conversations were submitted for sealing more than a month after the termination of the order authorizing the wiretap on the target line on which her conversations were intercepted. Finally, we hold that because the law enforcement officials who violated §§ 2516(2) and 2518(8)(a) were acting in good faith within the meaning of 18 U.S.C. § 2520(d), they are protected from a damage judgment. We therefore affirm, though on different grounds, the decision of the district court.

## I. Background

The following narrative is taken from Villa's complaint and from documents to which the complaint refers. We take as true the complaint's plausible and properly pleaded allegations, which we summarize here. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

On November 9, 2011, Deputy County Attorney Jennifer Brockel submitted an application for an order permitting wiretapping of four cell phones as part of a criminal investigation designated CWT-412. The application included three documents.

The first document was the application itself, dated November 9, 2011, and signed under oath by Deputy County Attorney Brockel. The preface to the application recited, "WILLIAM G. MONTGOMERY, the duly elected and qualified Maricopa County Attorney, by his appointed and

authorized Deputy County Attorneys of Maricopa County, Jennifer Brockel and/or Vanessa Losicco and/or Jeffery Beaver and/or Tony Novitsky, being duly sworn, deposes and says: . . . ." Paragraph V of the application recited further, "That he, WILLIAM G. MONTGOMERY, designated in writing that Deputy County Attorneys of Maricopa County, Jennifer Brockel and/or Vanessa Losicco and/or Jeffery Beaver and/or Tony Novitsky, has authority pursuant to A.R.S. § 13-3010(A) to make further applications for amendments or extensions of the Order authorizing interception of communications."  Brockel stated in the application that she had read a sworn affidavit signed by several detectives, that there was probable cause to believe that there had been and would be violations of specific provisions of Arizona criminal law, that there was probable cause to believe that electronic interception would provide evidence of these crimes, that other investigative techniques had been tried and failed, and that further pursuit of other investigative techniques would be unlikely to succeed or would be dangerous.  The application requested that the Maricopa County Attorney, the Phoenix Police Department, or the Drug Enforcement Administration or their representatives be authorized to engage in interception.  The application sought a court order authorizing wiretaps on four specified targeted telephone numbers ("Target Lines 1–4"), used by two named persons.  County Attorney Montgomery did not sign the application.

The second document was a lengthy affidavit dated November 9, 2011, signed under oath by three Phoenix Police Department detectives, to which Brockel referred in her application.

The third document was an authorization to apply for wiretaps, dated the day before, November 8, 2011, and signed under oath by County Attorney Montgomery.  In the document, Montgomery authorized "Jennifer Brockel and/or Vanessa Losicco and/or Jeffery Beaver and/or Tony Novitsky, Deputy Maricopa County Attorneys, to make application on my behalf for an Ex Parte Order for interception of telephonic . . . communications relating to" a list of specific offenses "which have been, are being, and will continue to be committed by" three named persons the targets of the wiretap, and "other known and unknown co-conspirators."  The caption of the document listed the four target lines specified in Brockel's application.  The document also listed three named persons, two of whom are specified in Brockel's application as using Target Lines 1–4.  Nowhere in the document did Montgomery state that he had personally reviewed any evidence supporting an application for a wiretap.

On November 9, 2011, a judge of the Maricopa County Superior Court signed an order authorizing wiretaps for thirty days on Target Lines 1–4.  Between November 18, 2011, and February 8, 2012, as part of investigation CWT-412, the same judge signed fourteen additional orders authorizing wiretaps on an additional twenty-eight target lines.

On November 23, 2011, Brockel applied for and obtained a wiretap order authorizing a wiretap for thirty days on Target Line 9, a line used by Hugo Gabriel Armenta-Castro. Armenta-Castro was one of the three persons specified in Montgomery's November 8 authorization and Brockel's November 9 application.  The telephone number for Target Line 9 was specified neither in Montgomery's authorization nor in Brockel's initial application.  The wiretap on Target

Line 9 was later extended for thirty days in an order dated December 21, 2011, based on a further application by Brockel.

On eight occasions on December 12, 2011, and January 8, 2012, Villa's conversations with her daughter over Target Line 9 were intercepted and recorded by Maricopa County officers. All of the recordings of the intercepted communications for the thirty-two target lines in investigation CWT-412 were submitted to the Arizona Superior Court for sealing on March 1, 2012.

## II.  Standard of Review

We review *de novo* a district court's dismissal for failure to state a claim pursuant to Rule 12(b)(6). *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1040 (9th Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.  Standing

Villa seeks statewide declaratory and injunctive relief on behalf of herself and the class she seeks to represent. She alleges standing to seek such prospective relief on two grounds — as a taxpayer in Arizona, and as an individual whose conversations were intercepted in violation of federal law. We hold that Villa lacks Article III standing to pursue either form of prospective relief. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011) (a plaintiff "must show standing with respect to each form of

relief sought"). Because Villa herself lacks Article III standing to pursue this relief, she cannot represent a plaintiff class seeking such relief. *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044–45 (9th Cir. 1999) (en banc).

For standing to seek prospective relief based on taxpayer status, Villa alleges that she is a resident of Maricopa County and that she pays taxes "in the state of Arizona." She does not explicitly so state, but we infer that she pays both state and county taxes. She further alleges that "defendants are using state and county taxes to investigate, detain, prosecute and imprison persons based on communications obtained from illegal wiretaps." Villa's status as a taxpayer does not confer standing to seek prospective relief against Defendants. In *Asarco Inc. v. Kadish*, 490 U.S. 605 (1989), the Supreme Court held that a state taxpayer must allege "'direct injury,' pecuniary or otherwise" to have taxpayer standing under Article III. *Id.* at 613–14 (quoting *Doremus v. Bd. of Education*, 342 U.S. 429, 434 (1952)). We see no reason why the standing analysis in a non-establishment clause case should be different for a county taxpayer challenging an allegedly illegal act of the county. *Compare Flast v. Cohen*, 392 U.S. 83 (1968); *Everson v. Bd. of Education*, 330 U.S. 1 (1947). Villa's allegation that her taxes have been used to finance Maricopa County officials who have "intercept[ed] communications in violation of Title III," is an insufficient allegation of direct injury within the meaning of *Asarco*.

For standing for prospective relief based on interception of her communications, Villa alleges that eight conversations were illegally intercepted in 2011 and 2012. The wiretap that intercepted these conversation has been terminated. Villa does not allege that she is more likely than any other member of the public to have her future conversations illegally

intercepted. In order to have Article III standing to seek prospective relief, Villa must allege either "continuing, present adverse effects" due to her exposure to Defendants' past illegal conduct, *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974), or "a sufficient likelihood that [s]he will again be wronged in a similar way." *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983). The allegations in Villa's complaint satisfy neither of these criteria. *See id.* at 105–106.

Although Villa lacks Article III standing to pursue prospective relief on her own behalf or on behalf of a class, she does have Article III and statutory standing to seek individual damages for past interception of her communications. Title III provides, "[A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a). Relief under Title III includes actual, statutory, and punitive damages. *Id*. § 2520(b)(2), (c).

## IV. Merits

Villa contends that two provisions of Title III preempt two provisions of Arizona's wiretapping statute, and that Defendants violated these two provisions of Title III. First, 18 U.S.C. § 2516(2) authorizes only the "principal prosecuting attorney" of a state or its political subdivision to apply to state courts for a wiretap order. The complaint alleges that County Attorney Montgomery, acting pursuant to Ariz. Rev. Stat. § 13-3010(A), improperly delegated to Deputy County Attorney Brockel the authority that he, as the "principal prosecuting attorney," was required to exercise.

Second, 18 U.S.C. § 2518(8)(a) requires that "[t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter" be recorded, and that the recording be submitted to the authorizing court "[i]mmediately upon the expiration of the period of the order, or extensions thereof." The complaint alleges that Brockel, ostensibly acting under Ariz. Rev. Stat. § 13-3010(H), did not timely submit the recordings of Villa's conversations to the Superior Court that authorized the wiretap.

## A. Preemption and Title III

Title III sets forth minimum procedural requirements for state and federal orders authorizing wiretapping. These requirements are a floor, not a ceiling. States may choose to enact wiretapping statutes imposing more stringent requirements, or they may choose to forego state-authorized wiretapping altogether. "[S]tates are 'free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation.'" *State v. Verdugo*, 883 P.2d 417, 420 (Ariz. Ct. App. 1993) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2187); *see also United States v. Marion*, 535 F.2d 697, 702 (2d Cir. 1976) ("But whether the proceedings be federal or state, interpretation of a state wiretap statute can never be controlling where it might impose requirements less stringent than the controlling standard of Title III."); *Sharpe v. State*, 350 P.3d 388, 390 (Nev. 2015) ("[S]tates were allowed to adopt their own wiretap laws, as long as they were at least as restrictive as federal legislation."); *State v. Serrato*, 176 P.3d 356, 360 (Okla. Crim. App. 2007) ("Under . . . Title III, a state wiretapping law can never be less restrictive than federal law."); *State v. Rivers*, 660 So.2d 1360, 1362 (Fla. 1995) ("[T]he federal wiretap statute envisions that States would be

free to adopt more restrictive legislation . . . but not less restrictive legislation." (citation and internal quotation marks omitted)); *People v. Teicher*, 425 N.Y.S.2d 315, 321 n.3 (N.Y. App. Div. 1980) ("It was intended that the minimum standards contained in the Act be binding on the states."); *State v. Hanley*, 605 P.2d 1087, 1091 (Mont. 1979) ("If a state chooses to allow electronic surveillance by adopting a statutory scheme, the scheme must be at least as or more restrictive than the regulations of Title III."); *State v. Farha*, 544 P.2d 341, 348 (Kan. 1975) ("If a state wiretap statute is more permissive than the federal act, any wiretap authorized thereunder is fatally defective and the evidence thereby obtained is inadmissible under 18 U.S.C. § 2515.").

Courts have articulated different standards for determining whether state wiretapping statutes are "less restrictive legislation" and therefore preempted by Title III. The Supreme Court of Kansas has held that state officials must follow the federal statute to the letter in obtaining admissible wiretaps. *See, e.g., State v. Bruce*, 287 P.3d 919, 924–25 (Kan. 2012) (declining to adopt court-specified parameters governing the delegation of application authority to assistant attorney generals and thus finding Kansas law preempted by Title III). The Supreme Court of Rhode Island has characterized Title III as "preempt[ing] the field in wiretap," and has held that state courts must adhere closely to the limitations on the use of intercepted communications articulated in Title III. *Pulawski v. Blais*, 506 A.2d 76, 77 (R.I. 1986).

Other state courts have taken a more flexible approach. Most prominently, the Supreme Judicial Court of Massachusetts has held that a state wiretapping statute is not preempted by Title III so long as it is "substantially similar in

design and effect to the Federal enactment." *Commonwealth v. Vitello*, 327 N.E.2d 819, 835 (Mass. 1975). Arizona courts have relied on *Vitello* in determining whether state wiretap provisions are "sufficiently compatible" with Title III. *See State v. Politte*, 664 P.2d 661, 669 (Ariz. Ct. App. 1982) (holding provisions in Ariz. Rev. Stat. § 13-3010 were not preempted because they were "sufficiently compatible with the federal [statute] or . . . the statute as a whole would ensure sufficient compliance with the federal standards" and further holding any divergent provisions "were ministerial or reporting requirements which would not lead to preemption even if different than the federal law").

In *United States v. Smith*, 726 F.2d 852 (1st Cir. 1984) (en banc), the First Circuit, reviewing wiretap procedures in Massachusetts under *Vitello*, discussed at length the standard by which a state's wiretapping procedures are to be assessed under Title III. The *Smith* court described the "basic presuppositions" of Title III as follows:

> that the objectives of federal legislation controlling electronic surveillance are to protect privacy, to establish uniform standards not only on a federal level but in a state or county governing the authorization of interceptions, and to ensure adherence to these standards through centralizing responsibility in top level state and county prosecutors who can be held accountable for departures from preestablished policy; and that, so long as federal standards are not jeopardized or eroded, state regulation is not proscribed but rather specifically contemplated.

*Id.* at 856.  In order to ensure that "federal standards are not jeopardized or eroded," the First Circuit asked whether state procedural protections under the statute were "equal to those required under Title III," or, in the words of *Vitello*, quoted in *Smith*, whether state procedural protections were "in substantial compliance with the federal law."  *Id.* at 856, 861, 857 (quoting *Vitello*, 327 N.E.2d at 825).  Reviewing not only the Massachusetts statute, but also the judicial interpretation of that statute by the Supreme Judicial Court, the First Circuit upheld the wiretap procedures in Massachusetts as consistent with Title III.  *Id.* at 863.

We agree with the approach taken by the First Circuit. We do not insist that the procedures set forth by state statute literally follow or perfectly mimic the provisions of Title III. Rather, so long as the state wiretapping statute, considered as a whole and as interpreted by state courts, is in substantial compliance with, and is therefore equal to, Title III, state wiretaps are permitted.

### B.  18 U.S.C. § 2516(2) and "Principal Prosecuting Attorney"

Title III provides, "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof . . . may apply" for an order authorizing a wiretap interception.  18 U.S.C. § 2516(2).  An application by such "principal prosecuting attorney" must include, *inter alia*, a "full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense . . . , (ii) . . . a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a

particular description of the type of communications sought to be intercepted, [and] (iv) the identity of the persons, if known, committing the offense and whose communications are to be intercepted," § 2518(1)(b); "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," § 2518(1)(c); and a "full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application . . . ," § 2518(1)(e). Based on the information provided by the applicant, the judge must determine whether "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [crime]," § 2518(3)(a); whether "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception," § 2518(3)(b); and whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," § 2518(3)(c).

Arizona Revised Statutes § 13-3010(A) provides:

> On application of a county attorney, the attorney general or a prosecuting attorney whom a county attorney or the attorney general designates in writing, any justice of the supreme court, judge of the court of appeals or superior court judge may issue an ex parte order for the interception of wire, electronic or oral communications.

Under Arizona law, the designated "prosecuting attorney" may provide the "full and complete statements" required under § 2518(1). Ariz. Rev. Stat. § 13-3010(B).

Villa contends that the principal-prosecuting-attorney provision of 18 U.S.C. § 2516(2) conflicts with Arizona law, which allows delegation of the power to apply for wiretap orders to a "prosecuting attorney." We agree.

The purpose of § 2516(2) is to ensure that "a publicly responsible official subject to the political process" personally approves a wiretap application. *United States v. King*, 478 F.2d 494, 503 (9th Cir. 1973) (quoting S. Rep. No. 90-1097, 1968 U.S.C.C.A.N at 2185). Just as the designation of "the principal prosecuting attorney of any State" who is "empowered to authorize interceptions" under § 2516(2) is a matter of state law, so is "[t]he issue of delegation by that officer." S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. at 2187. However, any state statute authorizing wiretapping "must meet the minimum standards reflected as a whole in" Title III. *Id.* As relevant here, state statutes that authorize delegation must respect the intent of § 2561(2), which "is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State . . . [or] the next political level of a State, usually the county." *Id*. The anti-delegation, or centralization, requirement is a "significant safeguard for the general public" and "not [a] mere technicalit[y]." *King*, 478 F.2d at 503, 505.

Our decision in *King* dealt with a wiretap conducted by federal officials, to whom Title III applies according to its precise terms. In assessing whether wiretapping by state officials comports with Title III and its centralization

requirement, we ask whether the state law's delegation provisions, as interpreted and applied, "achiev[e] the required centralized accountability." *Smith*, 726 F.2d at 856; *see also United States v. Tortorello*, 480 F.2d 764, 777 (2d Cir. 1973); *United States v. Pacheco*, 489 F.2d 554, 562 (5th Cir. 1974). That is, we ask whether the state procedures are "in substantial compliance with the federal law," and therefore "equal to those required under Title III." *Smith*, 726 F.2d at 857, 861 (quoting *Vitello*, 327 N.E.2d at 825).

The text of § 13-3010(A) closely resembles the text of the Massachusetts statute at issue in *Vitello* and later upheld, as applied, in *Smith*. The Massachusetts statute provided, "The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications." Mass. Gen. Laws Ann. ch. 272, § 99(F)(1); *Smith*, 726 F.2d at 857.

However, the First Circuit in *Smith* did not hold that the bare text of the Massachusetts statute complied with Title III. Indeed, it strongly implied that the broad delegation authorized by the Massachusetts statute, standing alone, did not comply and was therefore preempted by § 2516(2). *See Smith*, 726 F.2d at 857 ("If this were the complete statutory framework, appellants' arguments would have formidable force."). The First Circuit concluded the Massachusetts statute was consistent with § 2561(2) only because the Massachusetts Supreme Judicial Court had previously read limitations into the delegation authorized under the statute. In *Vitello*, the Supreme Judicial Court had imposed a "detailed judicial gloss in the nature of a set of required

procedures" on this statute. *Id.* This gloss included "specific requirements" that (1) "an assistant district attorney . . . bring the matter for examination before his senior officer, the district attorney"; (2) "the district attorney . . . determine whether a particular proposed use of electronic surveillance would be consistent with the overall policy" by way of a "full examination . . . of the application"; and (3) the district attorney "authorize each such application in writing." *Smith*, 726 F.2d at 857–58 (quoting *Vitello*, 327 N.E.2d at 819).

Arizona courts have not read into the Arizona statute limitations comparable to those read into the Massachusetts statute in *Vitello*. In the case before us, County Attorney Montgomery authorized four named Deputy County Attorneys, including Brockel, to apply for wiretaps in connection with investigation CWT-412. Montgomery's authorization listed four telephone numbers and three named persons using those numbers, but Montgomery did not state that he was personally familiar with any evidence providing probable cause that would justify a wiretap on any of those numbers or persons. Nor did he state that he knew that other investigative techniques had failed in the past and were likely to fail or be dangerous in the future. The next day, Deputy County Attorney Brockel filed an application, signed under oath, for a wiretap on the four telephone numbers specified in Montgomery's authorization. Brockel attached a lengthy sworn affidavit by three Phoenix Police Department detectives, that she attested to having read, providing probable cause to support the requested wiretaps and showing the failure of other investigative techniques.

In *Verdugo*, the Arizona Court of Appeals, relying on the decision of the Massachusetts Supreme Judicial Court in *Vitello*, held that a wiretap authorized by delegated authority

pursuant to Ariz. Rev. Stat. 13-3010(A) complied with § 2516(2). 883 P.2d at 420. The procedures by which the wiretap order in that case was obtained are very similar to the procedures in the case before us. In *Verdugo*, the County Attorney signed a document authorizing Deputy County Attorneys to apply for a wiretap. *Id.* Thereafter, a Deputy County Attorney applied for a wiretap, stating in his application that he had read affidavits establishing probable cause, and that investigative techniques other than wiretapping had been tried and had failed. *Id.* at 421. When the wiretap was later challenged in a motion to suppress in a criminal case, the County Attorney filed an affidavit "in which he stated that he decides the county's policy on wiretap investigations, including when to seek court approval." *Id.* The County Attorney "noted" in the affidavit "that before the application [in *Verdugo*] was filed, his deputy had informed him of the agency seeking the order, the crimes expected to be uncovered, the general background of the investigation and the reason for a wiretap request, and the resources to be used in the investigation." *Id.* In *Verdugo*, as in the case before us, the County Attorney nowhere stated — in his initial authorization or in his affidavit later filed in court — that he had personally reviewed the supporting affidavits or otherwise learned their contents.

We are willing to assume that the procedures followed in the case before us are identical to those in *Verdugo*, including the procedure described in the County Attorney's affidavit filed in resistance to the suppression motion. We hold that such procedures are not in substantial compliance with the principal-prosecuting-attorney requirement of § 2516(2).

We hold that, when a wiretap application is filed by a state, substantial rather than literal compliance with Title III

is required.  However, substantial compliance with Title III requires that the principal prosecuting attorney indicate, as part of the application process, that he or she is personally familiar with all of "the facts and circumstances" justifying his or her "belief that an order should be issued." 18 U.S.C. § 2518(1)(b).  Section 2516(2) tells us that it is the "principal prosecuting attorney" who "may apply" for a wiretap order. Section 2518 tells us what information must be in the application of the principal prosecuting attorney and what the issuing judge must find based on the information provided. These "facts and circumstances," specified in § 2518(1)(b), are at the core of the protections provided by Title III.

It is therefore not sufficient for the principal prosecuting attorney to state that he or she is generally aware of the criminal investigation, that he or she authorizes a deputy to seek wiretaps, and that his or her deputy has been authorized to review and present to the court the evidence in support of the wiretaps.  As we wrote in *King*, describing the principal-prosecuting-attorney requirement of Title III: "The Congress wanted each application passed upon by one of the highest law enforcement officials in the government[.] . . . The Congress expected them to exercise judgment, personal judgment, before approving any application."  478 F.2d at 503.

County Attorney Montgomery did not indicate, as part of the process of applying for the wiretap orders in this case, that he was himself familiar with the relevant facts and circumstances and that he had himself made the judgment that an application for a wiretap was justified.  We therefore conclude that the applications for the two judicial orders authorizing a wiretap on Target Line 9 violated Title III.

## C.  18 U.S.C. § 2518 and Sealing

Title III provides, "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."    18 U.S.C. § 2518(8)(a). Arizona Revised Statutes § 13-3010(H) provides, "Within ten days after the termination of the authorized interception, the recordings shall be made available to the judge who issued the order and shall be sealed under the judge's directions."

Villa contends that the sealing requirement of § 2518(8)(a) conflicts with Arizona law as applied in her case.  We agree.

Neither the federal nor the state sealing requirement is quite as clear as might at first appear.  With respect to § 2518(8)(a), we have held that "immediately upon the expiration" does not really mean "immediately."  Rather, it "means 'within one or two days.'" *United States v. Reed*, 575 F.3d 900, 913 (9th Cir. 2009) (quoting *United States v. Pedroni*, 958 F.2d 262, 265 (9th Cir. 1992)).  Moreover, the Supreme Court has held that recordings not turned over for sealing "immediately" are not *per se* inadmissible.  Late-sealed recordings may be admitted, provided that the government "explain . . . why a delay occurred [and] also why it is excusable." *United States v. Ojeda Rios*, 495 U.S. 257, 265 (1990).  A delay beyond one or two days thus does not necessarily result in exclusion; rather, it "calls for explanation." *Reed*, 575 F.3d at 913 (quoting *Pedroni*, 958 F.2d at 265).  However, deliberate delay is not a "satisfactory explanation." *Ojeda Rios*, 495 U.S. at 264.

With respect to § 13-3010(H), the date of termination "of the authorized interception" (the triggering date for the ten days within which the recording must be submitted for sealing) has not, in practice, meant the interception of a particular telephone line. In *Arizona v. Salazar-Rosas*, CR2012-006372-040 DT (Ariz. Sup. Ct., Oct. 18, 2013), criminal defendants moved to suppress conversations intercepted during investigation CWT-412 (the investigation in the case before us). In a decision denying the motion, the Arizona Superior Court wrote that the uniform practice in Arizona for more than twenty years had been to submit for sealing within ten days of the termination of the entire criminal investigation rather than within ten days of the termination of interception of particular target lines. However, the court declined to rule on the legality of this practice under § 13-3010(H). That is, it declined to decide whether the triggering date under § 13-3010(H) is the termination of the entire investigation or the termination of interception on a particular line. *See also Arizona v. Valadez-Sandoval*, CR2012-141355-005 DT (Ariz. Sup. Ct., Nov. 1, 2013) (same). In the appeal now before us, Defendants represented to the federal district court that the long-standing Arizona practice was abandoned sometime in 2014, and that recordings of intercepted conversations are now submitted within ten days of the termination of interception orders on particular target lines.

We conclude that allowing a ten-day period after termination of an interception order on a particular target line under Ariz. Rev. Stat. § 13-3010(H), as apparently now practiced by Arizona officials, does not substantially undermine the purpose of § 2518(8)(a). That purpose "is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance. . . . [T]he seal is a means of

ensuring that subsequent to its placement on a tape, the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded." *Ojeda Rios*, 495 U.S. at 263; *see also* S. Rep. No. 90-1097, at 2193 ("Paragraph (8) sets out safeguards designed to insure that accurate records will be kept of intercepted communications."). We recognize that any delay in submitting recordings allows an opportunity for tampering, but we do not regard a ten-day delay as significantly different from the delay allowed for federal wiretaps under Title III. We therefore conclude that a ten-day grace period after the termination of an interception on a particular telephone line, plus a possible extension of that period based on a sufficient explanation for lateness as permitted by the Court in *Ojeda Rios*, is in substantial compliance with § 2518(8)(a).

However, the long-standing practice that was still in effect when the recordings of Villa's intercepted conversations were submitted for sealing was not in substantial compliance with § 2518(8)(a). Under that practice, county officials submitted recordings of intercepted conversations for sealing only at the conclusion of an entire criminal investigation. In the case before us, the recordings of all intercepted calls were submitted to the Superior Court for sealing on March 1, 2012. That court had issued an order on November 9, 2011, authorizing wiretaps of Target Lines 1–4 for thirty days, and no extension order was entered for those lines. Thus, more than two-and-a-half months passed between the termination of the order and the submission of the recordings for sealing. For Target Line 9, the line at issue in this case, the court issued a thirty-day extension order on December 21, 2011, and no further extension order was granted. Thus, over a month passed between the termination of the extension order and the submission for sealing. The

Supreme Court in *Ojeda Rios* emphatically rejected an argument that would have permitted the government to "delay requesting a seal for months, perhaps even until a few days before trial." 495 U.S. at 263. Such a delay, the Court made clear, was fatally inconsistent with Congress's intent to minimize the possibility of tampering. Taking our cue from *Ojeda Rios*, we conclude that the long-standing Arizona practice, still in effect when Villa's conversations were submitted for sealing, did not substantially comply with § 2518(8)(a). *See United States v. Hermanek*, 289 F.3d 1076, 1085–87 (9th Cir. 2002) (sealing requirement of § 2518(8)(a) is triggered by the expiration of an intercept order for a particular phone number, not investigation as a whole). That is, the practice of waiting until the conclusion of an entire criminal investigation before submitting recordings of intercepted conversations for sealing was preempted by, and violated, § 2518(8)(a).

## V.  Relief

Title III provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a). That relief includes actual, statutory, and punitive damages. *Id.* § 2520(b)(2), (c). For the reasons given above, Villa does not have standing to seek prospective relief against Maricopa County or its officials, but she does have standing to seek individual damages. However, Title III protects a defendant who has acted in good faith: "A good faith reliance on . . . a court . . . order . . . or a statutory authorization . . . is a complete

defense against any civil or criminal action brought under this chapter or any other law." *Id.* § 2520(d).

Villa's rights under Title III were violated in two respects, but both violations were in good faith within the meaning of § 2520(d). First, the application for an interception order was not made by the "principal prosecuting attorney," as required by § 2516(2). But the application by Deputy County Attorney Brockel was made pursuant to the statutory authorization of Ariz. Rev. Stat. § 13-3010(A), and the interception of communications on Target Line 9 was made pursuant to Superior Court orders. Second, the submission for sealing on March 1, 2012, was made more than ten days after the termination of the order authorizing interception on Target Line 9 because the submission was made only at the completion of the entire criminal investigation, of which the wiretapping of Target Line 9 was a part. The submission for sealing at the conclusion of investigation CWT-412 may or may not have been in compliance with Ariz. Rev. Stat. § 13-3010(H). But it was done in accordance with a consistent and long-standing practice previously approved by Arizona courts. We therefore conclude that Villa may not recover damages for violations of her rights under §§ 2516(2) and 2518(8)(a).

## Conclusion

We hold that Ariz. Rev. Stat. § 13-3010(A), as applied by Maricopa County officials, is preempted by 18 U.S.C. § 2516(2), and that Villa's rights under § 2516(2) were violated by the interception of her communications on Target Line 9. We further hold that Ariz. Rev. Stat. § 13-3010(H), if interpreted to require submission for sealing within ten days of the termination of a wiretap authorization for each

target line, is not preempted by § 2518(8)(a). However, the recordings of Villa's intercepted communications were not submitted for sealing within ten days of the termination of the authorization for Target Line 9, resulting in a violation of § 2518(8)(a). Finally, we hold that Villa is not entitled to prospective relief on behalf of herself or the would-be class because she lacks Article III standing, and that she may not recover individual damages because Defendants are protected by the good faith provision of § 2520(d).

Costs on appeal to be assessed against Defendants/Appellees.

**AFFIRMED.**